Richard Kells JONES, on behalf of himself and all others similarly situated, Plaintiff,

v.

J. M. PENNY, Commissioner, North Carolina Department of Motor Vehicles; and W. D. Wooten, Executive Director, North Carolina Driver License Medical Review Board, Defendants.

Civ. No. C–74–2WS.

United States District Court, M. D. North Carolina, Winston-Salem Division.

Dec. 23, 1974.

Bertram Ervin Brown, II, and Reita P. Pendry, Winston-Salem, N. C., for plaintiff.

Robert Morgan, Atty. Gen., of N. C., and William B. Ray, Asst. Atty. Gen., of N. C., for defendants.

Before CRAVEN, Circuit Judge, and GORDON and WARD, District Judges.

CRAVEN, Circuit Judge:

Plaintiff has brought this § 1983 [1] action on behalf of himself and all others similarly situated against the Commissioner of the North Carolina Department of Motor Vehicles and the Executive Director of the Driver License Medical Review Board. At issue is the statutory procedure by which the Commissioner revokes the driver's license of one

---

1. 42 U.S.C. § 1983.

who has been legally adjudged incompetent or involuntarily committed to an institution for the treatment of mental illness, alcoholism, or drug addiction.

██ ██ Claiming that the revocation procedure denies procedural due process, is governed by vague and overbroad standards, and violates equal protection, all contrary to the fourteenth amendment, Jones and the represented class[2] pray for a declaration[3] of unconstitutionality and a permanent injunction[4] against the enforcement of the offending provisions.[5]

Subject-matter jurisdiction, as asserted, is grounded in 28 U.S.C. § 1343,[6] this being an action to redress deprivations by the named officials, acting under color of state law, of rights secured to the plaintiffs by the fourteenth amendment.

Both parties have now moved the court for summary judgment under Rule 56, Fed.R.Civ.P., the facts having been established by the pleadings, depositions, etc., without material dispute.

Although we hold the general statutory scheme valid, we find it procedurally flawed in two aspects when tested against the due process clause of the fourteenth amendment. Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971).

### FACTS

From April 13 to April 18, 1973, plaintiff Jones was committed, involuntarily,[7] for treatment at the state Alcoholic Rehabilitation Center at Butner, North Carolina. Pursuant to statutory requirement,[8] notice of the commit-

---

2. Defendants have not opposed the maintenance of this action as a class action. We find that the four prerequisites to a class action are present here, Fed.R.Civ.P. 23(a), and that the requested injunctive or declaratory relief with respect to the whole class is appropriate because "the party opposing the class has acted or refused to act on grounds generally applicable to the class . . . ." Fed.R.Civ.P. 23(b)(2). *See* Hammond v. Powell, 462 F.2d 1053 (4th Cir. 1972).

3. 28 U.S.C. §§ 2201, 2202.

4. Since the prayer is for a "permanent injunction restraining the . . . operation" of the revocation procedure "by restraining the action" of the defendant state officers in the execution thereof, on the ground of unconstitutionality, this three-judge court has been convened. 28 U.S.C. §§ 2281, 2284.

5. Plaintiff by supplemental complaint has additionally prayed that the defendants be required to notify promptly all members of the class that their licenses are reinstated and that the state will take no further action against them under the offending statute.

6. 28 U.S.C. § 1343(3) is a grant of original jurisdiction to the district courts of any civil action authorized by law
 To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States . . . .

7. The statutory procedure under which Jones was involuntarily committed was itself declared violative of due process under the fourteenth amendment by an intermediate North Carolina court, in a decision dated two months after the instant commitment occurred. In re Hayes, 18 N.C.App. 560, 197 S.E.2d 582 (1973). Jones, in the judicial review by the Wake County Superior Court of the final agency decision, *see* N.C. Gen.Stat. § 143-306 et seq. (1974), apparently asserted that the revocation under N.C.Gen.Stat. § 20-17.1, note 8 *infra*, should be voided because his commitment was, if *Hayes* operated retroactively, unconstitutional. The superior court found in May 1974 that *Hayes* was not to be retroactively applied and, rejecting Jones's other contentions, affirmed the revocation. There is no record of any appeal from the trial court's decision. Plaintiff has not presented this claim to this court, and we decline to consider it.

8. The requirement of notice to the Commissioner by the committing institution is contained in that section of the motor vehicle code against which plaintiff has directed his principal charge of unconstitutionality. It provides, in pertinent part:
 § 20-17.1. Revocation of license of mental incompetents, alcoholics and habitual users of narcotic drugs.—(a) The commissioner, upon receipt of notice that any person has been legally adjudged incompetent or has been involuntarily admitted as an inpatient to an institution for the treatment of the mentally ill or an institu-

ment was given by the institution to the Commissioner of Motor Vehicles.

That notification [9] set into motion the provision principally under attack:

> § 20–17.1. Revocation of license of mental incompetents, alcoholics and habitual users of narcotic drugs.—(a) The commissioner, upon receipt of notice that any person has been legally adjudged incompetent or has been involuntarily admitted as an inpatient to an institution for the treatment of the mentally ill or an institution for the treatment of alcoholism or drug addiction, shall forthwith make inquiry into the facts for the purpose of determining whether such person is competent to operate a motor vehicle. Unless the Commissioner is satisfied that such person is competent to operate a motor vehicle with safety to persons and property, he shall revoke such person's driving privilege. No

driving privilege revoked hereunder shall be restored unless and until the Commissioner is satisfied that the person is competent to operate a motor vehicle with safety to persons and property.

N.C.Gen.Stat. § 20–17.1(a) (Supp.1971). The Commissioner's "inquiry" followed a fairly routine pattern. The Department of Motor Vehicles (DMV) asked Jones, then a licensed driver, to submit to a "reexamination" of his driving ability; Jones passed that test on August 6, 1973. The state's Department of Human Resources, by letter dated May 23, 1973, asked Jones to submit a report from his doctor. That report, submitted August 22, 1973, noted Jones' past problems with alcohol and included the doctor's affirmation that he "would . . . be willing to ride with him as the operator of a motor vehicle." The medical report [10] from the rehabilitation

---

tion for the treatment of alcoholism or drug addiction, shall forthwith make inquiry into the facts for the purpose of determining whether such person is competent to operate a motor vehicle. Unless the Commissioner is satisfied that such person is competent to operate a motor vehicle with safety to persons and property, he shall revoke such person's driving privilege. No driving privilege revoked hereunder shall be restored unless and until the Commissioner is satisfied that the person is competent to operate a motor vehicle with safety to persons and property.

(b) If any person shall be adjudged as incompetent for any reason, the clerk of the court in which any such adjudication is made shall forthwith send a certified copy of abstract thereof to the Commissioner.

(c) The person in charge of every institution of any nature for the care and treatment of the mentally ill, the care and treatment of alcoholics or habitual users of narcotic drugs shall forthwith report to the Commissioner in sufficient detail for accurate identification the admission of every person. The provisions of this subsection shall not apply to any person who voluntarily enters an institution for the treatment of a mental illness, alcoholism or habitual use of narcotic drugs.

(d) It is the intent of this section that the provisions herein shall be carried out

by the Commissioner of Motor Vehicles for the safety of the motoring public. The Commissioner shall have authority to make such agreements as are necessary with the persons in charge of every institution of any nature for the care and treatment of the mentally ill and of alcoholics or habitual users of narcotic drugs, to effectively carry out the duty hereby imposed and the person in charge of the institutions described above shall cooperate with and assist the Commissioner of Motor Vehicles.

. . . . .

(f) Revocations under this section may be reviewed as provided in G.S. 20–9(g)(4).

N.C.Gen.Stat. § 20–17.1 (Supp.1971).

9. Those in charge of the appropriate institutions are directed to "report to the Commissioner . . . the admission of *every* person," but excepted from being reported is "any person who *voluntarily* enters" an institution of the type enumerated. *Id.* § 20–17.1(c) (emphasis added).

10. The "discharge summary" from the institution at Butner stated that Jones had had six prior admissions to an alcoholic rehabilitation center; that his lifestyle since 1952 apparently had been one of constant hospitalization; that he was "well known for his drinking problem and irresponsible behavior"; and that he stated "he started back to drinking just because he wanted to."

center was obtained. These two medical reports, together with Jones's driving record,[11] were forwarded[12] to the "Driver License Medical Advisor," a physician employed on a consultant basis by the State Board of Health, for his review and recommendation.[13]

The Medical Advisor in turn, on September 4, 1973, referred[14] Jones's file to a "Medical Consultant Panel" composed of three physicians, for its review and recommendation. On October 25, 1973, the three-man panel, by two to one vote,[15] recommended that Jones's driving privilege be "disapprov[ed]," with op-portunity to "review" in July 1974.[16] The panel's conclusion of incompetency to drive on medical grounds, approved by the Medical Advisor, became the basis for the Commissioner's decision to revoke Jones's license under § 20–17.-1(a), i. e., the Commissioner was not "satisfied that [Jones was] competent to operate a motor vehicle with safety to persons and property." Id.

By letter dated November 9, 1973, Jones was notified by the DMV that, effective November 27, 1973, his driver's license was revoked.[17] Informing Jones generally of the procedures which pre-

11. Jones's driving record was not a good one: numerous moving violations; a prior suspension in 1963; conviction for hit-and-run causing property damage in 1968; and two accidents in 1970 and 1972, as to each of which the accident reports indicated drinking and possibly impaired driving ability. Also in the possession of the DMV were records of two prior commitments of Jones for treatment as an alcoholic, in 1954 and 1955, but the record does not show whether these records were in fact forwarded to the medical advisor.

12. The date is uncertain but appears to have been sometime in August 1973.

13. While the Commissioner of Motor Vehicles has the sole statutory authority to reinstate a license, Mr. Wooten stated that the decision is left up to him in his position as Executive Secretary of the Medical Review Board and that the recommendation of the Medical Advisor "is followed" by the Department of Motor Vehicles. Deposition of W. D. Wooten, June 14, 1974, at 5. Affidavit of W. D. Wooten, July 1, 1974, at 2.

14. "If the Medical Advisor approves the licensee, no further action is taken. If [he] disapproves the licensee or has serious doubt about his competency to drive," the case is referred to the three-man panel. Wooten Affidavit at 1.

15. Of the two voting to disapprove, one suggested that review with "psych. exam and opinion" should be held in October 1976; the other recommended review in July 1974 with the statement "[w]ould doubt that this applicant will ever be able to drive." The dissenting physician recommended a medical report in six months and a "check in" every six months until September 1974.

16. This "review", as explained by Wooten, contemplates the submission after that date of a current medical report from the licen-see's doctor. The Medical Advisor would then review the case and submit his recommendation to the DMV. Wooten Deposition at 4.

17. The letter read as follows:

As provided by G.S. 20–17.1, the Department has examined into the facts of your recent hospital commitment. As a result of your commitment and as provided by the Statute, a copy of your medical records was furnished to the Department for medical evaluation for the purpose of determining whether you are competent to operate a motor vehicle. The Driver Medical Adviser at the State Board of Health, who reviews such records for the Department, has recommended that you be disapproved for driving.

After reviewing your medical records and the recommendation of the Driver Medical Adviser, it is the opinion of the Department, that your health is such as renders you incompetent to operate a motor vehicle with safety to persons and property. For this reason, it becomes necessary that we inform you that you are prohibited from operating motor vehicles in North Carolina. An Official Notice and Record of Revocation of Driving Privilege is attached.

As recommended by the Driver Medical Adviser, the Department will further consider your case on or after July 1, 1974 provided you furnish for evaluation a current medical report from your physician with other such information as may be necessary to establish your competency to drive, to the satisfaction of the Department.

G.S. 20–9 provides that whenever a license is denied by the Commissioner for medical reasons, such denial may be reviewed by a Reviewing Board upon written request of the applicant filed with the Department within ten days after receipt of such deni-

ceded the decision, the letter stated that the DMV would "further consider" [18] his case after July 1, 1974, provided that he furnish a then-current medical report and "other such information as may be necessary to establish" competency to the Department's satisfaction.

Jones was also informed that the statute,[19] in a case of denial for medical reasons, provided for review upon written request. In closing, however, the letter told Jones that "[a]n applicant or licensee who has been denied a license pursuant to a hearing before the [Driver License Medical Review Board] may not file a new application until the expiration of two years after the date of such denial by the Board." In the Board's form letter by which Jones, on December 11, 1973, requested a review hearing, he affirmed by his signature that:

> I . . . understand the Statutes provide that should I be denied a license pursuant to a hearing before the Board, I may not file a new application for a license until the expiration of two (2) years after the date of such denial by the Board.

On January 15, 1974, a hearing was held "[t]o review [Jones's] case . . . for the purpose of determining whether said person is competent" to drive.[20] By written decision and order filed February 8, 1974, the Medical Review Board concluded upon extensive findings of fact that Jones's privilege should be withheld at least until November 15, 1974, during which period total abstention must be demonstrated;

thereafter, if the privilege were restored, Jones should submit to periodic examinations. On February 14, 1974, Jones was informed by letter [21] from the defendant that the Board had "sustained" the DMV's revocation and had ordered that Jones not be granted driving privileges.

■ The Board's decision was upheld on appeal to the Wake County Superior Court, which ruled on May 30, 1974, that the revocation decision was supported by substantial evidence in the record. This action had been filed in the meantime in January 1974.[22]

Plaintiff, representative of all legal incompetents and involuntary admittees for whom an automatic inquiry under § 20–17.1 has resulted in revocation, assails that section as to the classification it draws, the standards it applies, and the procedure it allows. Also attacked is N.C.Gen.Stat. §. 20–9(g)(4)g.'s two-year waiting period, in that it applies only to those who appeal to the Medical Review Board.

### I.

■ Plaintiff argues that the line drawn in § 20–17.1(a) and (c) between involuntary and voluntary admittees bears no rational relationship to the purpose sought to be furthered, namely, the protection of the motoring public. That the burden of § 20–17.1's administrative scrutiny and potential loss of license is visited only upon plaintiff's class, leaving the voluntary admittees unaffected, is said to be totally arbitrary and therefore violative of the fourteenth amendment's equal protection clause.

al. An applicant or licensee who has been denied a license pursuant to a hearing before the Board may not file a new application until the expiration of two years after the date of such denial by the Board. The letter was accompanied by an "Official Notice and Record of Revocation of Driving Privilege G.S. 20–17.1," dated November 13, 1973, which stated that the "Cause of Revocation" was "Incompetent to drive following medical evaluation as provided by G.S. 20–17.1".

18. *See* note 16 *supra.*

19. N.C.Gen.Stat. §§ 20–9 and 20–17.1(f) (Supp.1971).

20. "Notice of Hearing" sent from the Review Board to Jones, Dec. 19, 1973.

21. Mr. Wooten's letter has not been made a part of the record. Jones's supplemental complaint quotes portions of it, with presumed accuracy.

22. Exhaustion of remedies is not an issue in a § 1983 action. King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968).

The Court agrees with both parties' assumption that this classification must be examined under the less exacting, "rational basis" test:

> The tests to determine the validity of state statutes under the Equal Protection Clause have been variously expressed, but this Court requires, at a minimum, that a statutory classification bear some rational relationship to a legitimate state purpose.

Weber v. Aetna Casualty and Surety Co., 406 U.S. 164, 172, 92 S.Ct. 1400, 1405, 31 L.Ed.2d 768 (1972). Plaintiff asserts that the only legitimate state interest that might rationally be served is North Carolina's stated policy of encouraging the voluntary use of treatment facilities.[23] But, it is argued, while *that* goal might be legitimate it has nothing to do with protecting the public from incompetent drivers and therefore cannot supply the requisite "state purpose." *See* Morey v. Doud, 354 U.S. 457, 77 S. Ct. 1344, 1 L.Ed.2d 1485 (1957); Smith v. Cahoon, 283 U.S. 553, 51 S.Ct. 582, 75 L.Ed. 1264 (1931). However, the statute itself (§ 20–17.1(d)) defines "the safety of the motoring public" as its underlying purpose.

The precise burden placed upon the affected class by § 20–17.1 is *not* revocation but, as plaintiff's brief concedes, only "administrative scrutiny and possible loss of . . . license." Voluntary admittees, while excluded from the § 20–17.1(c)'s notice requirement and thus from the Commissioner's scrutiny under subsection (a), are obviously not thereby immunized from loss of license.

The classification *does* subject the involuntary admittee to special scrutiny; it does *not* automatically and necessarily deprive him of his license: "Unless the Commissioner is satisfied [upon his inquiry] that such person is competent to operate a motor vehicle with safety . . ., he shall revoke" the license. *Id.*

Is there any rational basis for specially examining and scrutinizing *involuntary* admittees? We think so. Whether or not it be true, we think it rationally within the legislative prerogative to conclude that those who require involuntary commitment tend to present as a class a greater threat to highway safety than those who voluntarily commit themselves.[24] Lawmakers may reasonably believe that members of the latter group who acquiesce in, if not actually seek, institutional help thereby demonstrate concern for themselves and others and may therefore be better driving risks. Or, conversely, the legislature may rationally conclude that a voluntary admission does not, by itself, generate sufficient suspicion of driving incompetency to trigger a special investigation. To decide that those whose institutionalization was legally coerced present, as a class, significantly greater highway safety problems and thus require renewed scrutiny as to driving skills is, whatever its wisdom or efficacy or validity in a particular case, not irrational under the equal protection clause.[24A]

Asserting that the distinction drawn by § 20–17.1 "in no way can be claimed to promote highway safety," plaintiff

---

**23.** N.C.Gen.Stat. § 122–58.1 (1974) states: It is further the policy of the State . . . to encourage the utilization of voluntary admissions to programs and treatment facilities . . . .

**24.** The legislature has in effect made such a finding with respect to its policy for involuntary admissions:

It is the policy of the State to insure that no person shall be committed to a treatment facility unless he is determined to be *dangerous* to himself or others or *gravely* disabled.

N.C.Gen.Stat. § 122–58.1 (1974) (emphasis added).

**24A.** Indeed, since a plenary hearing, pursuant to N.C.Gen.Stat. § 122–58.1 et seq., is now conducted prior to any involuntary commitment, the legislature might perhaps reasonably decide that persons so committed are *prima facie* incompetent to operate a motor vehicle; provided, of course, that prior to revocation the procedure would afford due process including the right to offer evidence of competency to drive and evidence bearing upon the appropriate and necessary period of suspension, if any.

relies heavily upon Baxstrom v. Herold, 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966), where the Court struck down the statutory scheme by which New York committed state prisoners with suspected mental problems to mental institutions upon the expiration of their terms. Prisoners were treated differently in two respects: (1) all potential civil committees could on demand receive a *de novo* review before a *jury* of a prior incompetency certification, except prisoners, whose cases were tried solely to the court; and (2) only prisoners could be assigned to hospitals for the *dangerously* mentally ill without benefit of a judicial determination thereof. The simple fact of confinement in a penal institution, the Court held, had no relevance to the grant of judicial review before a jury on the question of mental illness; nor did it rationally relate to dangerousness, because those with prior criminal records *not* in prison at the time of commitment proceedings received a hearing. 383 U.S. at 111–115, 86 S.Ct. 760.

*Baxstrom* and its progeny [25] are clearly distinguishable. Denial of equal protection in each lay in the state's application to the class of a more streamlined commitment procedure than that generally available for civil commitment: the statute burdened those having a given status in a way that had no rational relationship to any aspect of that status. In *Baxstrom* the classification's purported rationale of "criminal propensities" simply collapsed under close analysis. Here, as we have pointed out, § 20–17.-1's close reevaluation of Jones's competency to drive is triggered by a status,

one element of which—involuntariness—does bear a rational relationship to a quality deemed necessary for safe driving—a healthy desire for self-preservation and a concern for the safety of others.

That North Carolina has not chosen in § 20–17.1 to include "all alcoholics and drug addicts" is not, as plaintiff asserts, irrational. Whether we think it wise is of no consequence, for in this area of state regulation

> a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some "reasonable basis," it does not offend the Constitution simply because the classification "is not made with mathematical nicety or because in practice it results in some inequality," Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78 [31 S.Ct. 337, 340, 55 L.Ed. 369]. "The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific." Metropolis Theatre Co. v. City of Chicago, 228 U.S. 61, 69–70 [33 S.Ct. 441, 443, 57 L.Ed. 730]. "A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." McGowan v. Maryland, 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393.

Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970).

Since we have found that a legitimate state interest may be rationally advanced [26] by the classification drawn

---

25. Humphrey v. Cady, 405 U.S. 504, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972), involved an attack by a habeas corpus petitioner upon Wisconsin's Sex Crimes Act, the procedural protections of which were allegedly less comprehensive than those provided under the state's Mental Health Act, *e. g.*, the latter granted a right to a jury trial. The Court reversed and remanded for a hearing on whether, if the two Acts were not mutually exclusive, any justification existed for the different treatment. In Jackson v. Indiana,

406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972), the state's more lenient commitment standard and more stringent standard of release applicable to those found incompetent to stand trial, as compared with those standards generally applicable to persons not charged with crime, were found to deny equal protection.

26. Since we have found the classification rationally related to the purpose of the section containing it, we do not reach plaintiff's ar-

in § 20–17.1, we hold that it does not deny plaintiff and his class equal protection of the laws.

## II.

■ Section 20–17.1 is attacked alternatively as exacting "obedience to a rule or standard . . . so vague and indefinite as really to be no rule or standard at all." A. B. Small Co. v. American Sugar Refining Co., 267 U.S. 233, 239, 45 S.Ct. 295, 297, 69 L.Ed. 589 (1925). The statute [27] is deficient, plaintiff asserts, in four respects: (1) it does not specify what "facts" relate to competency; (2) the nature and scope of the Commissioner's "inquiry" are not delineated; (3) "competent to operate a motor vehicle" is not itself a sufficiently specific standard; and (4) the kind of showing necessary in order that the Commissioner be "satisfied" is not set out.

Responding to the first two assertions, we think that the type of "facts" to be looked into and the scope of the "inquiry" are tied to the obvious purpose of § 20–17.1: to determine driving competency. By themselves they set no standard against which the plaintiff's privilege is judged; plaintiff has suggested no prejudice that might result from the lack of guidance given to the Commissioner in his inquiry.[28]

As to the word "satisfied," plaintiff argues that only a subjective state must be achieved by the Commissioner, thereby implying unchecked discretion in his determination. But we think the statute imparts an objective standard, and that the phrase "is satisfied" refers to the conclusion the Commissioner reaches after his "inquiry into the facts for the purpose of determining whether such person is competent to operate a motor vehicle . . . with safety to persons and property . . . ." Section 20–17.1 simply assigns to the Commissioner the power and duty to revoke in the first instance unless he finds, on the basis of the facts before him, driving competency. There is no suggestion that the Commissioner may revoke for any reason or none at all or that his subjective satisfaction is determinative.[29]

gument that the state's interest in encouraging voluntary use of mental health treatment facilities, while legitimate, cannot justify a classification in a statute purportedly designed to protect the motoring public. *See,* *e. g.,* Prostrollo v. University of South Dakota, 369 F.Supp. 778 (D.S.D.1974), where a university regulation requiring single freshmen and sophomores to live in dorms, the object of which was primarily retirement of bond indebtedness and not advancement of education, was held violative of equal protection. We might note in contrast that the Supreme Court has recently rejected the proposition that the classification attacked must rationally relate to the perceived primary purpose of the legislation :
> Permitting nullification of statutory classifications based rationally on a nonprimary legislative purpose would allow courts to peruse legislative proceedings for subtle emphases supporting subjective impressions and preferences. The Equal Protection Clause does not countenance such speculative probing into the purposes of a coordinate branch.

McGinnis v. Royster, 410 U.S. 263, 277, 93 S.Ct. 1055, 1063, 35 L.Ed.2d 282 (1973). Whether North Carolina's policy of encouraging voluntary admission would qualify as a "nonprimary" purpose of § 20–17.1 under *Royster* need not be decided.

27. See note 8 *supra* for full text.

28. Furthermore, since our decision will require a *prior* hearing on the question of competency, plaintiff and his class will have the opportunity to attack as irrelevant any data which the Commissioner might have garnered in an unbridled "inquiry."

29. Plaintiff cites Baxstrom v. Herold, discussed *supra,* wherein the Court noted that under the statute the committing "judge need only satisfy himself that the person 'may require care and treatment in an institution for the mentally ill'." 383 U.S. at 112, 86 S.Ct. at 763. But it is clear from the opinion that the defect lay not in the phrase "satisfy himself" but in the fact that once the decision was made to commit the prisoner at the expiration of his term, the *further* decision to commit him to an institution for the dangerously mentally ill was made administratively and was unreviewable. Since the other persons so committed were entitled to a *judicial* proceeding, the equal protection violation was manifest.

Plaintiff's vagueness argument, we think, really boils down to an assertion that "competent to operate a motor vehicle with safety to persons and property" amounts to no standard at all. We cannot agree. Plaintiff has not suggested in what way the North Carolina legislature could or should have been more specific in guiding the Commissioner's determination. Section 20–17.1 sets out a general principle to be followed which is readily comprehended by the layman and leaves the details of its administration with those having the expertise to execute it. *Cf.* Whitfield v. Simpson, 312 F.Supp. 889 (E.D.Ill.1970). Competency to drive in North Carolina, as in most states, embraces a driving test, a written examination, a test for vision, and, for plaintiff's class, certification of mental health by a board of physicians, with attendant medical reports. We do not think the due process clause requires the legislature to set out in full detail all indicia of the ability to drive a car. *Cf.* United States v. Harriss, 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 889 (1954).

If § 20–17.1 fairly informs those it affects of the standard against which their conduct will be measured, no constitutional infirmity is presented. Colten v. Kentucky, 407 U.S. 104, 110, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1972). Given the recent Supreme Court approval of dismissal from government employment "for such cause as will promote the efficiency of the service," Arnett v. Kenne-

dy, 416 U.S. 134, 140, 94 S.Ct. 1633, 1635, 40° L.Ed.2d 15 (1974), and of a court-martial for "conduct unbecoming an officer and a gentleman," Parker v. Levy, 417 U.S. 733, 748, 94 S.Ct. 2547, 2558, 41 L.Ed.2d 439 (1974), we think the standard set out in § 20–17.1 —a statute employed solely in a civil context to an entitlement under state law—more than satisfies due process.[30]

 Plaintiff has also asserted that since § 20–17.1's language is so broad as to reach constitutionally protected activity, *i. e.*, the right to drive an automobile, it should be declared unconstitutional under the overbreadth doctrine. *See, e. g.,* Grayned v. City of Rockford, 408 U.S. 104, 114, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). We need not dwell at length on this point, for the argument fundamentally misconceives the rationale behind overbreadth. It is the actual prohibition or chilling of *substantive constitutional* rights, *e. g.,* freedom of speech, by a too-broadly worded statute that justifies its wholesale invalidation. *See* Note, The First Amendment Overbreadth Doctrine, 83 Harv.L. Rev. 844, 852–53 (1970). Plaintiff has no substantive constitutional right to drive an automobile under Bell v. Burson, *supra*, or any other case.[31]

We therefore find § 20–17.1 neither vague nor overbroad.

### III.

Plaintiff has attacked § 20–17.1 as empowering the Commissioner to de-

---

30. Plaintiff's reliance upon Giaccio v. Pennsylvania, 382 U.S. 399, 86 S.Ct. 518, 15 L. Ed.2d 447 (1966), is completely misplaced. There, a statute allowing a jury in a misdemeanor case to impose costs upon an acquitted defendant was found devoid of standards or conditions, to wit: jurors "shall determine, by their verdict, whether the county, or the prosecutor, or the defendant shall pay the costs." State court decisions provided that imposition of costs was proper, for example, if the jury found the defendant's conduct "reprehensible in some respect." 382 U.S. at 404, 86 S.Ct. at 518. Section 20–17.1, by contrast, requires competency in a particular skill with reference to a clear, albeit general, standard—safety to persons and property.

31. Discussing the concept of "property" under the fourteenth amendment, the Supreme Court stated:

Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Discussed *infra* are the *procedural* due process rights which must attend a deprivation of the instant state-created "entitlement."

prive him of property without due process of law.

■■ First, the question of whether a driver's license is "property" to which the fourteenth amendment's protections attach is settled:

Once licenses are issued, as in petitioner's case, their continued possession may become essential in the pursuit of a livelihood. Suspension of issued licenses thus involves state action that *adjudicates important interests* of the licensees. In such cases the licenses are not to be taken away without that procedural due process required by the Fourteenth Amendment. Sniadach v. Family Finance Corp., 395 U.S. 337 [89 S.Ct. 1820, 23 L.Ed.2d 349] (1969); Goldberg v. Kelly, 397 U.S. 254 [90 S.Ct. 1011, 25 L.Ed.2d 287] (1970). This is but an application of the general proposition that relevant constitutional restraints limit state power to terminate an entitlement whether the entitlement is denominated a "right" or a "privilege."

Bell v. Burson, 402 U.S. 535, 539, 91 S. Ct. 1586, 1589, 29 L.Ed.2d 90 (1971).

In *Bell*, the Court considered Georgia's Motor Vehicle Safety Responsibility Act, which provided that the vehicle registration and driver's license of an uninsured motorist "involved" in an accident shall be suspended unless he posted security in an amount sufficient to cover damages claimed by aggrieved parties in the accident report. Excluded from the hearing prior to suspension was any consideration of the motorist's "fault" or "liability." The Court held that since "fault" was an essential element of the decision to suspend the license, the state "must [prior to suspension] provide a forum for the determination of the question whether there is a reasonable possibility of a judgment being rendered against him as a result

of the accident." 402 U.S. at 542, 91 S. Ct. at 1591.

■ Secondly, then, as in *Bell*, we must consider the *nature* of the procedural due process which must be afforded the licensees here after their initial involuntary admission, notice of which triggers the operation of § 20–17.1. In *Bell*, the constitutional infirmity lay in the fact that, while the hearing preceded suspension, consideration of the essential element was excluded. Here, while the crucial element of § 20–17.1—driving competence—is considered [32] prior to suspension, the licensee is given no notice and is excluded from participation in any way unless and until a request for *post*-revocation review is submitted.

Speaking to the question of timing, the Supreme Court, in Boddie v. Connecticut, 401 U.S. 371, 379–380, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971), stated:

That the hearing required by due process is subject to waiver, and is not fixed in form does not affect its root requirement that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest, except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event.

(emphasis in original) (footnotes omitted). Under *Boddie* and the substantially identical language used by the Court in *Bell*,[33] justification for North Carolina's *ex parte* revocation procedure must flow from substantial countervailing governmental interests.

The interest pressed by the state is, of course, the preservation of safety on the roads. More specifically, and in harmony with the need for summary action found paramount in those cases embodying the exception, the state asserts that involuntary admission demonstrates at

---

32. *See* text accompanying notes 9–17 *supra*.

33. "[E]xcept in emergency situations (and this is not one) due process requires

. . . 'notice and opportunity for hearing . . .' *before* the termination becomes effective." 402 U.S. at 542, 91 S.Ct. at 1591. (emphasis in original) (footnotes omitted).

least a suspicion of immediate danger to public safety. *See, e. g.,* Ewing v. Mytinger & Casselberry, Inc., 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950).

We need not decide whether that factor alone could outweigh plaintiff's due process rights, for the administrative facts belie the state's "emergency" justification. Jones was involuntarily admitted to "an institution for the treatment of alcoholism" on April 13, 1973, and discharged five days later. Not until more than *seven months* later, on November 27, 1973, did his revocation become effective. There is no evidence that the "danger" posed by any of the members of Jones's class elicited any swifter response. The defendant Wooten stated in response to an interrogatory that "there is an approximate minimum 60-day lapse of time between the receipt of the notice of involuntary commitment and the mailing of an order of revocation by the [DMV]."[34] (Answer, Supplemental Interrogatory 3, April 16, 1974).

Furthermore, in a true emergency where summary action might indeed be justifiable, the temporary deprivation attending such a pre-hearing revocation can at least be mitigated by prompt post-revocation proceedings. But North Carolina, in what must be deemed, absent other evidence, a typical case, did not inform Jones of the outcome of the post-revocation "review" hearing until almost three months after the revocation had become effective. There is, needless to say, no effective substitute for a driver's license in our mobile society, save in perhaps a few major urban centers; and nothing on the order, for example, of a back pay award can compensate the aggrieved licensee.[35]

We are, therefore, persuaded that this case falls squarely within the general rule framed by Mr. Justice Brennan in Bell v. Burson, *supra*—absent a clear showing of facts justifying resort to the emergency doctrine. Accordingly, we hold that Jones and the class he represents are entitled to notice and hearing before the Department of Motor Vehicles *prior* to any revocation of their driving privileges.

We need not delineate the specific contours of such a hearing other than to suggest that North Carolina need add to what is now provided in its *post*-revocation hearings only the right of cross-examination in order to comply fully with minimal due process. Indeed, N.C.Gen. Stat. § 20–9(g)(4)[36] establishes a more

---

34. Wooten also stated that the length of time, beyond the approximated 60-day minimum, varied depending upon the response of the physicians and licensee to the requests for medical data.

35. It is the lack of (1) a prompt as well as plenary post-deprivation procedure; (2) viable alternative relief while a full hearing is pending; and (3) a realistic prospect of having the loss fully restored which, among other factors, distinguishes this case, as to the right to a *prior* hearing, from Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40 L. Ed.2d 15 (1974). The Court there was presented with a claim that a federal, nonprobationary civil service employee could not be dismissed under the Lloyd-La Follette Act without a trial-type preremoval hearing. While no majority opinion emerged, Mr. Justice Powell's concurring opinion, impliedly supported by at least five members of the Court, found by accommodating the competing interests of the employee and the government that a full trial-type hearing prior

to termination was not required: (1) the employee received 30 days' advance notice of the specific charges, to which he could respond both in writing and orally, by personal appearance, before the authoritative official; (2) the notice of the agency's action must have specified in writing which of the charges were sustained; (3) a full evidentiary hearing would follow reasonably promptly; (4) back pay would be awarded upon reinstatement; (5) temporary employment in the private sector was not at all foreclosed. These mitigating factors, considered in light of the government's substantial interest as an employer in maintaining efficiency, discipline, and morale, led a majority of the Court to reject any inflexible requirement of a trial-type hearing.

36. This review procedure, made applicable the § 20–17.1 revocations by § 20–17.1(f) and granted upon the licensee's timely, written request, provides in pertinent part:
a. Applicants shall be afforded an opportunity for hearing, after reasonable notice

trial-like procedure than perhaps could be compelled by the Constitution.

Accordingly, if the state provides upon request substantially the same kind of hearing as set out in § 20–9(g)(4) prior to revocation, at which the licensee has a fair opportunity to rebut any claim that his involuntary commitment and the reasons underlying same have shown him to be incompetent to drive with safety to persons and property, then due process will surely have been satisfied.

## IV.

A related, but separate, element of the state statutory scheme has also been attacked as unconstitutional. While the state, in conforming its existing procedure to our mandate might moot the question, we cannot at this stage avoid it.

Under the present framework, as has been noted, revocations under § 20–17.-1's *ex parte* procedure may be "reviewed" administratively under § 20–9(g)(4), as provided in § 20–17.1(f).[37] Section 20–9(g)(4), which by its terms applies also to an initial *denial* of a license for medical reasons, establishes a laudable mechanism for review by a five-man board (Driver License Medical Review Board). One subsection thereof, however, provides: "An applicant or licensee who has been denied a license pursuant to a hearing before the board may not file a new application until the expiration of *two years* after the date of such denial by the board." N.C.Gen.

of not less than 10 days, before the review board established by subdivision (4). The notice shall be in writing and shall be delivered to the applicant in person or sent by certified mail, with return receipt requested. The notice shall state the time, place, and subject of the hearing.

b. The review board may compel the attendance of witnesses and the production of such books, records and papers as it desires at a hearing authorized by the section. Upon request of an applicant, a subpoena to compel the attendance of any witness or a subpoena duces tecum to compel the production of any books, records, or papers shall be issued by the board. . . .

c. A hearing may be continued upon motion of the applicant for good cause shown with approval of the board or upon order of the board.

d. The board shall pass upon the admissibility of evidence at a hearing but the applicant affected may at the time object to the board's ruling, and, if evidence offered by an applicant is rejected the party may proffer the evidence, and such proffer shall be made a part of the record. The board shall not be bound by common law or statutory rules of evidence which prevail in courts of law or equity and may admit and give probative value to evidence which possesses probative value commonly accepted by reasonably prudent men in the conduct of their affairs. They may exclude incompetent, immaterial, irrelevant and unduly repetitious evidence. Uncontested facts may be stipulated by agreement between an applicant and the board

and evidence relating thereto may be excluded. All evidence, including records and documents in the possession of the Department of Motor Vehicles or the board, of which the board desires to avail itself shall be made a part of the record. Documentary evidence may be received in the form of copies or excerpts, or by incorporation by reference. The board shall prepare an official record, which shall include testimony and exhibits. A record of the testimony and other evidence submitted shall be taken, but it shall not be necessary to transcribe shorthand notes or electronic recordings unless requested for purposes of court review.

e. Every decision and order adverse to an applicant shall be in writing or stated in the record and shall be accompanied by findings of fact and conclusions of law. The findings of fact shall consist of a concise statement of the board's conclusions on each contested issue of fact. Counsel for applicant, or applicant, if he has no counsel, shall be notified of the board's decision in person or by registered mail with return receipt requested. A copy of the board's decision with accompanying findings and conclusions shall be delivered or mailed upon request to applicant's attorney of record or to applicant, if he has no attorney.

The Review Board set up by § 20–9(g)(4) has five members. Obviously, that many need not be provided at the initial hearing —one impartial examiner is sufficient at this "trial" level.

37. *See* note 8 *supra*.

Stat. § 20–9(g)(4)g. (Supp.1971). (emphasis added).

This singular treatment of those in Jones's class who choose to exercise the right of review contrasts with other statutory provisions. First, certain licensees whose privileges are revoked come under the following general provision: "When a license is revoked under any other provision of this article which does not specifically provide a period of revocation, the period of revocation shall be one year." N.C.Gen.Stat. § 20–19(f) (1965). Secondly, § 20–17.1 does not, by its plain terms, "specifically provide a period of revocation." [38] Section 20–19(f)'s one-year period, therefore, applies initially to those licensees whose privileges are revoked under § 20–17.1. But to those of that class who, like Jones, choose to exercise their right of review before the Board, § 20–9(g)(4)g. in effect penalizes that choice, for a losing party, by foreclosing renewed application for two years.

The Medical Review Board, commendably, ignored the statutory mandate: its February 1974 decision provided that, with total abstention, Jones's revocation could be reconsidered after November 15, 1974, given the requisite showing of competence. The DMV, on the other hand, represented in its communications that § 20–9(g)(4)g. would be enforced literally; its November 1973 letter notifying Jones of the revocation so stated.[39] In any case, that the DMV and the Medical Review Board seem to disagree in practice[40] is of no consequence. Of controlling importance is the unquestioned *availability* of § 20–9(g)(4)g.—its plain words authorize the DMV to apply it in a given case.

The question, then, is whether North Carolina can so condition—indeed discourage—a party from seeking review of an administrative decision. The state, apparently conceding that those who seek and lose on review are treated unequally as to the revocation period, asserts nevertheless that such treatment is unconstitutional only upon a showing of intentional or purposeful discrimination.

 We disagree. We think it clear from established decisional law, in both criminal and civil contexts, that a state in granting the right to appeal an adverse decision cannot penalize or arbitrarily condition that right. *E. g.*, Pearce v. North Carolina, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969); Patton v. North Carolina, 381 F.2d 636 (4th Cir. 1967), cert. denied, 390 U.S. 905, 88 S.Ct. 818, 19 L.Ed.2d 871 (1968). Section 20–9(g)(4)g., *mandating* greater deprivation upon an unsuccessful appeal, codifies an unnecessary discouragement to review which goes even further than the "hazard of being penalized for seeking a new trial" which characterized *Pearce*. Colten v. Kentucky, 407 U.S. 104, 116, 92 S.Ct. 1953, 1960, 32 L.Ed.2d 584 (1972). We can see no justification for its presence other than to minimize the number of appeals for the convenience of the DMV. *Cf.* Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972).

 Therefore, to the extent that the state's response to our decision in Part III, *supra,* preserves or includes a right to administrative review, we hold that it is prohibited from attaching to the exercise thereof a condition that an unsuccessful attempt will result in a longer revocation period.

For the reasons stated, an appropriate declaratory judgment will be entered declaring N.C.Gen.Stat. § 20–17.1 unconsti-

---

38. We cannot accept the state's bald assertion that § 20–17.1 is not embraced by § 20–19(f): "[a]lthough [§ 20–17.1] does not establish a uniform time unit to be applied to each revocation, it does provide for the revocation's duration by establishing a specific event upon which revocation is to terminate," namely, the Commissioner's finding of competency. Brief for Defendant at 13. Section 20–19(f) does not speak in terms of a "specific event" but operates when a "period" is not "specifically" provided.

39. *See* text accompanying notes 17–19 *supra.*

40. Wooten, the Board's executive secretary, could not explain the apparent inconsistency. *See* Wooten Deposition at 387–388.

tutional for failure to provide a hearing on the question of competency prior to revocation—absent a clear showing of facts thought to be sufficient to constitute an emergency requiring immediate protection of the public. N.C.Gen.Stat. § 20-9(g)(4)g. will also be declared unconstitutional because without justification it chills the right of appeal to the Review Board. Because of administrative difficulty that might unduly burden the state, we decline to grant plaintiffs' prayer that the state be required to initiate restoration of licenses that have been taken under the statutes that we now hold unconstitutional. Instead, we think it more sensible to require that the individual plaintiff and members of his class seek relief from the Department of Motor Vehicles in light of our decision herein.

Since we have no reason to apprehend that the Department of Motor Vehicles [41] will fail to follow the decision we have reached today, in our discretion we decline the prayer for injunctive relief.

41. We note that any person aggrieved by a final decision of the Department of Motor Vehicles may, pursuant to N.C.Gen.Stat. § 20-9(g)(4)f., secure judicial review under Article 33, Chapter 143, of the General Statutes of North Carolina.